If it may please the court, Roberto Stanziel on behalf of Shane Davis, representing his minor child, J.D.D. We are here today, Your Honor, because we have appealed the lower court's ruling which granted summary judgment on behalf of the defendants Weaver and Riley. There was also an issue concerning our injunctive relief against the head of DCF Carroll. We have chosen not to appeal that issue. So we are only presently here on what I could say is ultimately two issues. The first one being that we respectfully believe that the court made a mistake in granting qualified immunity to the two defendants and in making a determination that the two defendants were not deliberately indifferent to a serious medical need of our client, J.D.D. As the court is probably aware, I think this case falls in a very specialized circumstance in the sense that the majority of these cases are ultimately dealing with prisoners and with whether or not their rights were violated concerning medical need. We have a case here that I think requires kind of special attention and a special analysis in the sense that what we have here is a minor infant that was born at a hospital to a mother who we know what the facts are. The court made conclusions concerning the facts that the child was born cocaine positive, the mother was cocaine positive, the mother had no prenatal care, the mother had had four of her last seven children removed from her as a result of drug abuse. We know that the mother had at one point been also addicted to heroin and had had a conviction for prostitution. Those are all the things that are known in the file. What the lower court ultimately ruled is that we produced no evidence which indicated that subjectively either one of these two case workers, that's Weaver and Riley, Weaver being the hands-on case worker, Riley being her supervisor, that we produced no evidence that subjectively they made the inference that you take those facts, the child ultimately needed to be tested for HIV, which it was not. We believe that the court erred in a few respects in that regard when it comes to deliberate indifference. Number one, the court injected an affirmative defense on behalf of the defendants, which the defendants never raised themselves. That would be the affirmative defense of something being mere negligence and a reasonable mistake as to what Weaver believed she had the authority to do. What we show is that there is significant evidence that was in the file that a reasonable and that Riley were deliberately indifferent. Well, the point that you're talking about and that I'd like to get right too is that under Farmer v. Brennan, the defendant must consciously disregard a substantial risk of harm. How have you shown that? That's what I don't understand. How have you shown that? Sure. I think also under Farmer, it can be done through circumstantial evidence. So what do we have in the file? We have all of those factors that we know that Weaver knew. We have the specific federal statutes for testing. We have Florida Statute 39, which specifically requires testing for communicable diseases. And then at the time, we have the administrative code, which was in effect at the time in 2000, which specifically required that the child be tested for communicable diseases and HIV when a child is brought into shelter. Well, I thought you were using that theory to show clearly established. Correct. I did not intend you to be using that to show this conscious indifference. Well, I think where we can get the conscious indifference from circumstantial evidence is a couple fold. Number one, but the important part of the case is, and I think maybe the lower court kind of looked over it. What we're talking about is the first six weeks of this child's medical care. We know that it was child was taken in the DCF custody. We have a court order. The court order was April 17, 2000. It was within one week from the date that the child was born. Pursuant to that court order, DCF became the local parentis of that child and is responsible for that child's medical care. That's right in the order. So we know that we have that. We know that they have had training concerning HIV. We know that although there is significant medical documentation in the file, in the DCF file, and the defense raises that issue a lot, that medical documentation does not begin until months later. So what we have is in the record, in the first six weeks, there is no medical information whatsoever that this child received, the early screening that was required, any type of medical care that was required. We know that there is no documentation whatsoever that any testing was done at the hospital. But don't, doesn't that end up cutting against you because don't we have to, don't we have to conclude in order to find deliberate indifference that these individuals knew that this child either should be tested for HIV or likely had HIV and deliberately decided not to do that? And if it's that obvious, then wouldn't we think that one of these many medical professionals who dealt with a child would have also made that same conclusion? Well, I think to a certain extent from what's in the record, it's kind of almost a little bit of a red herring because we don't know what happened. We have no medical records. We have nothing in the file. We don't know anything that the hospital staff said or didn't say or didn't recommend. What we do know... Well, we know there wasn't an HIV test. We know there wasn't an HIV test. Well, the court concluded that you can make, I guess, the assumption that there wasn't an HIV test. But I think what the real issue here is, is in the position that DCF was in, in protecting an infant child that, you know, unlike medical, unlike prisoners with medical issues, my stomach hurts, I have a pain, I have this, there's nothing that that child ultimately can do. So the question then becomes, what is their responsibility when presented with these facts to ensure that that was done? The issue, I don't think, is the risk that he had HIV. The issue is the risk that he was exposed potentially to HIV and that all of these risk factors were present that the assumption could have been made, was made, that, you know, this child should have been tested and there was nothing done to follow up or prove ultimately that that was done. To me, this sounds like you are making an argument that is fundamentally a misdiagnosis argument, a non-professional misdiagnosis argument. That's the closest analogy that I can come up with. That these ladies knew certain facts and that based on those facts, they should have taken certain evidence. So what we have then is this kind of non-professional standard. I don't know what these ladies knew. And so it's hard for me to know what they should have understood based on the facts that you outlined at the very beginning. I don't know what they should have known. I don't know what they, not to mention that they knew best. And then disregarded that they knew there was some serious harm. Based on my review of Dr. Gonzales' deposition, it looks to me like this child went through early life in good health or with some problems that were normal for a child like asthma and HIV. And it really wasn't until quite a bit later. The child came in with a crush. That is correct, Your Honor. But that is the prognosis of HIV. And Dr. Tureen testified to that, who was our expert. And then there was Dr. Rodriguez, who was the doctor who actually took care of JDD when he was finally diagnosed at the age of 14. You're not going to get those symptoms. You're not going to have a baby because it's very asymptomatic. You're not going to have a baby in the beginning that's going to express those, that's going to be able to say those, or ultimately that they're going to show. So what it comes down to is you have an individual who is specifically placed in the position of ensuring that a baby that cannot speak for themselves, that cannot come forward and say what's hurting them, to piece those factors together and to reach that conclusion. And under the facts... Your Honor, what you just said is exactly what I'm pointing out, that it's a misdiagnosis. What you just described to me is a classic misdiagnosis. I think a misdiagnosis is ultimately when the symptoms are there and a medical professional thinks it's something else. And this is a case where what you're looking at is you have circumstances of a birth that are known to these people that that could potentially expose the child to HIV transmission. So we're not looking to diagnose. We're not looking to treat an illness. We're looking to say there is that risk. Did they follow up to ensure that anything was done? But there's still a difference between this case. Let's say it actually said in the records the child may have been exposed to HIV and the defendants did nothing. That's a different case from saying they have to draw the inference that the child was exposed to HIV and then have the testing done. Do you see the distinction? Oh, I certainly do, Your Honor. The first one would obviously be direct evidence, and if that was in the file, I don't think we would be here today. The issue that we have here is, is there significant, you know, just like Farmer and the other cases that follow up on Farmer, you don't have to have that absolute direct knowledge of what that illness is. There's a whole plethora of cases that we've quoted that come after Farmer, including a very recent one that came out of this jurisdiction just this year in 2019, and that's the case of Taylor v. Hughes, where you have an inmate who's at the jail, he's complaining that he's got pain, he's hurting. So do the guards have to say, well, wait a minute, I've got to make a diagnosis that maybe this is something wrong? They conclude he's probably just drunk. So what Taylor went on to say is, you don't have to have in your mind what the exact element is. The fact that you knew you were presented with that and you did nothing raises a question that ultimately your jury should decide. Let me ask you a question about your claim about the right to a screening. Are you arguing that there was a right to a screening generally that wasn't done and that that would have led to HIV testing, or there was a right to HIV testing from the outset? It's two parts, Your Honor, and I kind of argue both of them. I think under the federal early detection statute, 42, he had a right to be tested. He was supposed to be tested. As a matter of fact, in the court file, or I'm sorry, in the DCF file, there was one piece of paper that the child was supposed to go to Kruger Medical, which was Dr. Gonzales, for that particular testing. For HIV testing? Well, it was for the early detection and screening. So what happened was, apparently he never went because nothing's filled in on that form. There was a later document that said maybe hinted to it, but the court threw that out. That's not part of the evidence ultimately in this case. So what the real issue is, is it falls down to the second position under whether or not they were deliberately indifferent, which are the cases that deal with when wholly nothing's done. When there is no documentation in the file, which we have here, in that window of six weeks, later on when the child's put in foster care, you know, there was follow-up, there's things that are done, but not within that ultimate critical period. And the question is, by having done nothing, does that make them deliberately indifferent based upon the facts which they were presented with and which the court said that they knew? Well, the problem seems to be that when this child was born, the child was not. You could not look at this child and determine that there was anything wrong with the child. The child obviously couldn't make any complaints. And if you go back and you read McElligott v. Coley, Farrell v. West, as you just cited, there's typically, there's commonly both, I see the prisoner and I hear the prisoner or some combination of that, and I am alerted to the fact that there may be a serious medical need, but the reality is there was no serious medical need except this McElligott v. Coley antibody problem that nobody can see without testing. And this preliminary testing doesn't include HIV anyway. Well, the federal statute doesn't specifically mention HIV, but certainly Florida Statute 39 mentions communicable diseases. You know, what's the number one communicable disease, especially back in 2000? It was HIV. But then the administrative code, which was in effect, specifically mentions HIV. And what we're looking at in that regard when it comes to, you know, the issue of their qualified immunity and was it clearly defined, you really, when you put it all together, the totality of the circumstances, otherwise what were these people doing? What was their job supposed to be? When they take a little infant, that medically, you're not going to know it has AIDS. You don't contract AIDS as an adult or as a baby, and immediately there's symptoms that you say, oh, this person has HIV. Let's, I mean, let's be fair. It's obviously a tragic start for this little infant, no matter how you cut it. But it's not as if, it's not as if nothing was done, right? A very particular test wasn't done. Your Honor, I respectfully disagree. Being placed in local parenthesis, having a court order that they're supposed to be doing the medical treatment. And what's interesting is, if you look at the deposition of Mr. Clifford, who was the foster parent initially, when a foster parent takes on a child, they have zero right to any medical records. If the child gets sick, they just bring it to the doctor. They can't see the bill. They can't see the medical records. They got to call the DCF worker. It's that DCF worker who's responsible for all those medical records and to determine ultimately what needs to be done, being in that position to monitor the child. And once again, not as a parent, as somebody who's trained specifically to come in and handle these children in our state that have been, that have ultimately been abandoned. So I think it's the lack of evidence in the case, the lack that anything was done, especially within that first six-week period, that raises a question of, you know, were they deliberately indifferent? Any more questions? Thank you. You'll have your full time left for rebuttal. May it please the Court. My name is Benjamin Stronzal, along with my partner Samuel Mandelbaum. We represent the appellees Pauline Riley, William Weaver, and the Department of Children and Families. The name is Secretary Carroll on there. He's no longer actually the Secretary. Your Honors, this is a tragic situation. This is, you know, a depressing situation. It's the only civil rights case I've handled with a completely innocent plaintiff. Now, the... If I can go back here just a moment, I'm going to be handling the first eight minutes of the argument on the deliberate indifference standard, and if it's okay with the Court, Mr. Mandelbaum will be handling the other seven minutes of the argument. Now, the District Court, which we believe properly ruled in favor of the appellees in this situation, found that there wasn't any deliberate indifference on the part of Pauline Riley and William Weaver. The District Court separately found, as to each one of them, looked at what they knew at the relevant time period, what inferences they may have been able to draw from that evidence, what a reasonable person in their position may have been able to draw, whether they actually drew the inference. The District Court properly ruled that not only would they have had to draw the inference that the child may have been at risk for HIV, but that the mother also would have had HIV. Otherwise, there is no chance of in utero transmission. Do you agree that if these workers have been told that the mother had HIV, do you think in that case, not testing the child would have constituted deliberate indifference? If they were told by a medical professional? Yes. If they were told by a medical professional that the child needed to be tested for HIV and they didn't, I believe under the case law, yes, that probably would amount to that if they were specifically told that information because that shows a direct knowledge, not even a subjective awareness, which is the standard, but that would show then a direct knowledge of a substantial risk. What do you think would be, and I understand that you don't think there was enough here, but what would be enough besides direct knowledge in order to support that subjective understanding that the child needed to be tested? In a situation like this? That's a difficult question to answer. It's a novel situation, unlike the Miguelicot case or the de Villas case, where there's actual awareness or enough evidence to show that there should have been awareness. That's difficult for me to tell, and like Mr. Stanzielli alluded to, this was something that was determined 14 years later, so the files and the records were sparse or inadequate at best in a lot of ways. What we do know that they knew was that the child was in the hospital for the first seven days. The child was under oxygen in either the NICU or the intensive care, I think it was the NICU actually, on oxygen and monitored by medical professionals for seven days. They didn't order a test. They didn't draw the inference. He was taken to Dr. Gonzalez for a three-year period. Dr. Gonzalez testified that he was aware of some of these facts and never drew that inference. The sheriff's office who got the initial abuse report from Bayfront Medical on April 10, 2000 didn't draw that inference. Now there's a six-week period that Mr. Stanzielli talks about, and so if that's the critical period, according to Dr. Tureen, when this could have been resolved, then the information that they are charged with would have had to have been known during that six-week period. The only information they would have known during that six-week period, based on the record evidence, is that the mother had no prenatal care, that the mother had four of seven previous children taken for cocaine or drug addiction at birth, and also that the child was born with cocaine in the system. The prostitution was not a conviction. It was an arrest. We have objected to that evidence. That didn't come until later. That came after the six-week period. The part about the heroin addiction or heroin treatment, and it wasn't actually addiction, came after that six-week period. Those are the only factors that they would have known during that six-week period. The predisposition study was done on May 31, 2000. It was signed and executed that day. That's after the six-week period. So even the information on that, they wouldn't have known. But if you look at the predisposition study, which was done by Jewel Shorter of the Pinellas County Sheriff's Office, it specifically says, to the best of that author's knowledge, there is no health issues with this child. These two ladies who dedicated a part or most of their lives to DCF and helping children, there was no deliberate indifference. They didn't know or even become subjectively aware and say, we're just not going to have this kid tested. They took the child to all of the medical appointments. The Cliffords testified to that as well. Dr. Gonzalez testified to that as well. So it's also possible that they're, you know, I won't even go into it because the district court didn't accept it, but Dr. Rodriguez, who is world-renowned for HIV treatment and is treating the child now, said it's possible a test was done and it wouldn't have shown positive. We don't know that. We don't have the records. In addressing, I don't know if you want me to address, but the issue that he's raised about a sua sponte affirmative defense being raised by the court, we believe that has no merit. The court specifically in the order said that this isn't relevant. They were just talking in the order about whether there was a mistake. Furthermore, mistake is not a separate affirmative defense from qualified immunity. That's Pearson v. Callahan and Butts v. Kanemu, which is out of the 11th Circuit, that says mistakes in judgment or facts or law are covered under qualified immunity. So we don't believe there was any need to raise an additional affirmative defense. We don't believe that the court actually did raise a sua sponte affirmative defense, and even if they did, we don't believe it was something that the court relied upon. Going back to the subjective awareness, we believe that it's an issue of what they actually knew at the time. We believe that this case is most likened to Jackson v. West out of the 11th Circuit, Omar v. Babcock, also out of the 11th Circuit, and Towsend v. Jefferson County, also out of the 11th Circuit. If you read Jackson v. West and Towsend, both of them talk about situations where the guards are both prison cases because that's the standard for children in custody, but both of those talk about guards relying on medical opinions to some extent. In Towsend, it was a woman who had a miscarriage while in prison, and she had complained over and over throughout the day of vaginal bleeding and of abdominal pains. She told the guards over and over, and the guards got a nurse to come to her. The nurse checks her out, and the nurse says, you know, she needs to be seen by a doctor, but this isn't an emergency. She's okay for now. So she doesn't get seen until, you know, she actually doesn't get seen by a doctor at all because she has a miscarriage shortly after that. The district court had denied summary judgment for the defendants, and the 11th Circuit stepped in and said, well, they were relying on the opinion of a medical professional who said this wasn't an emergency, so how could they be subjectively aware that there was an emergency? To come to that inference, to come to that subjective awareness, they would have had to disregard what the medical professional told them. Now, in this situation, I know we don't have statements from medical professionals, but there are things we can deduce logically from the medical professionals. The child was in the hospital for seven days. We know that a lab test was done. Otherwise, they couldn't have confirmed that there was cocaine in his system at the time of birth. We know that Dr. Gonzalez saw the child. You know, there's a dispute over when the first appointment was, but there's no dispute that there was regular appointments thereafter for a three-year period. The, you know, medical professionals didn't draw the inference. The sheriff's office didn't draw the inference. The treating physician didn't draw the inference. But yet, the two defendants are held to be, should have drawn that inference or that it was that obvious. Mr. Stancielli alluded that there was HIV training for these two individuals. I would say that the testimony says there was a few courses for one of them, nothing substantive or in-depth. So, my time is up. If you have any questions, I'd be happy to answer them. Turn it over to Mr. Mandelbaum. We have another, uh... I'm so sorry. Good morning or afternoon, Your Honors. My name is Sam Mandelbaum. I'm Ben Stronzl's partner at Mandelbaum, Fitzsimmons, Hewitt & Cain, and AMPA. I'm going to talk about the element of clearly established law. Contrary to what appellant has argued, we believe that the law was not clearly established as to our client's duty to, or responsibility, to obtain HIV testing for this child. If we look at the law, from this court's case a few years ago in Melton v. Abstin, this court said that qualified immunity protects government officials from liability for civil damages. And so far as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. And we look at that at the time the actions would have taken place or should have taken place, which essentially means that we're looking at a clearly established principle being there by 1999 or early 2000. Also, the unlawfulness of the conduct must be apparent from the pre-existing law before the incident took place. He's making the obvious clarity argument here in terms of, I mean, he said twice in his brief that these were novel facts. And so I'm wondering what you have to say about the obvious clarity argument. I'm sorry, the obvious? The obvious clarity argument that it's so obvious that this was wrong, that there doesn't need to be any case law to put them on notice. Well, just the facts that were apparent to our clients, there did not appear to be an obvious duty to refer this child for HIV testing. The child had already had an extraordinarily long hospitalization after his birth. Seven days is an unusual time period to be hospitalized. The social workers did get on the case fairly quickly within a week or two. And at least the records show that the first appointment that the baby had a medical appointment was on April 24th, roughly two weeks after his birth. Although I know Appellant's Counsel is contesting that that appointment took place, but we do have an appointment slip in the record. The judge did disregard it for the purposes of summary judgment. And we saw What were the grounds on which the judge rejected that document? Excuse me? Why did the judge reject that document? It didn't have a date on it or a signature on the appointment form. It did show there was an appointment for April 24th. And I think it was for summary judgment purposes since Appellant was contesting it. That was scheduled at North Pinellas Children's Medical Center. And then on April 27th the DCF took custody of the child. And we see starting in June and continuously every few weeks or so, the child had medical consultations at Suncoast Crook Medical Center with Dr. Richard Gonzalez. And that went on for pretty much through 2010. There was testimony by the case worker that if she had seen that there had been no initial medical screening she could have told her supervisor who would have made that happen. Isn't that right? I guess theoretically. So they weren't entitled to rely 100% on an assumption that the medical professionals had done something, right? Well, our social workers are not they don't have medical training. They're not doctors or nurses. But they could notice that there had been no screening. That's something that would have been within the purview of their experience. And if they had noticed that, they could have made that happen, right? They both did not see from what facts were before them or at least when questioned 18 years later at their depositions. That's a different question. Whether there were sufficient facts there that they should have made that referral is a different question. My question is simply they couldn't rely 100% on the fact that the child had been seen by a doctor at some point and therefore there was nothing that needed to be done, could they? I think that they were aware that there was medical workup at that one week hospitalization for the baby and at least it was their impression that there was a full medical screening done at that time. Let's say in a different case, so you don't worry that you're conceding anything about the facts of this case. Let's say in a different case if social workers are objectively aware that no medical screening has been done. Would their experience mean that they should request some kind of medical screening? I think in general, probably yes. But here Ms. Kylie, our client who was she was deposed and she said that she would not have accepted custody of the child if he hadn't been given a full medical screening. If I recall her testimony correctly. Another point and we think this is a real gap in the case. There's no evidence that the child contracted the HIV virus from the mother nor is there any evidence that the mother did in fact have HIV or AIDS or whatever it is. In our opinion, this is just a pyramiding of inferences. That's a causation argument. Did you make that argument at the district court level? I don't remember that. Did we both? It was brought out. We brought that out. I don't think we argued pyramiding of inferences but I don't think it's... Yeah. That's something we don't know. Was the law clearly established that the child was entitled to an initial screening which would include testing for communicable diseases including HIV? Our clients would have had to have known that it was a clear violation of law back in 2000. I'm just talking about what law was clearly established now, not what they actually... I don't think there was much if any law there other than to give general medical treatment to the child for what they did know which was that the child was born with cocaine in his system that he had a few other not very serious conditions where he was underweight and regular well baby treatment from that on. Do you dispute what your opponent has said about the statute and the administrative law at the time regarding initial screening and testing? We believe that that does not mandate HIV screening or testing especially under these circumstances. It says should but not shall and so it's not mandatory. Thank you. I think what the first issue I should raise here is that the defense can make some kind of assumptions that there was medical records, there were medical records. What we do know is this there were medical records in the file there were a plethora of medical records but what the lower court ruled is that it's abundantly clear that in the first six weeks there are none and that the two parties knew of these factors. So then what we have to do is we have to say... I have a question about the factors. Do you dispute the contention that no one was aware during the first six weeks of a mother's prostitution history or heroin history? No, we don't know that. The fact is, Your Honor, we don't know. The file, like I said, for the first part of up to about a month of the child's life the record's not clear with any medicals and with that type of information we're not exactly sure ultimately when that was placed into the file. Within the first six week period. We know at some point they would have discovered it. The heroin and the prostitution those were things that were related to her background. So then what we get, they were in records of previous DCF files. So did DCF have that information in their possession in the first six weeks? Absolutely they did. If they had conducted an investigation into her background as it relates specifically to this child not the other five cases that they had, they would have certainly found that. So then it would have been in the file. Aren't those two facts important pieces of the puzzle that would suggest that the child needed HIV testing? Because obviously cocaine is ordinarily not injected, right? I would disagree, Your Honor. I disagree. Cocaine can be snorted, smoked, injected. It can be, but ordinarily, right? Wouldn't you say that if you were going to choose between an HIV test for a heroin addict and a cocaine addict and you only had one, wouldn't you ordinarily give the test to the heroin addict? I would ordinarily give the test to all of them. Doesn't the record reflect that she smoked cigarettes? Smoked cocaine every day like cigarettes? Yeah, that was one. And that's also part of the same document that we're not too sure ultimately when it was in the file. But I think what the real key factor here is whether or not there was a question for the jury to determine if they were deliberately indifferent. And I know that there's the direct subject of standard, but this is a novel case in the sense that if there is ever a case where the court is supposed to say a lack of medical evidence, a lack of any of the testing being done within that six-week period, is something that a jury should decide. Is it that complete lack of medical evidence sufficient to go to the jury to make a determination that in and of itself that's deliberate indifference, which is ultimately what we have here. There's no evidence that they followed up. There's no evidence that the child was tested. There's no evidence within that time period that he received any kind of medical care. And, you know, they did testify that they took a course that was a weekend course for 48 hours on HIV in foster children. I mean, it would be kind of hard to believe. I thought it was part of that. That was on training, but it wasn't 48 hours on that. I mean, would the training not include what happens when a child is brought in who would need to be tested? We ultimately don't know. But what we do know from Weaver and from Riley, Weaver at some point in her deposition says she didn't think he had the authority for testing. But if the court looks at our briefs when I specifically asked her, was she aware of the Florida standard and the Florida statute for testing for communicable diseases, she specifically said that she was. And then when I asked her, did you do that in this case, she said, her exact words were, I don't do that. And then she says, if it was not in the file, I could have gone to a supervisor to ask if it was. So we know that she knows that she had the authority to go ahead and ask for that test. And if it wasn't in the file, that she would go to her supervisor and make sure that it was done. Riley, on the other hand, what she testifies to is under no circumstances did she have any authority whatsoever to have a child tested, which clearly controverts any of the statutes or any of the rules in the administrative code and certainly contradicts the Weaver testimony, which says, yeah, you know, in the Florida statute, I was fully aware that I had the authority to have that testing done. And if it wasn't there, I would have asked to make sure it was. Thank you. We've got your argument. The court will be in recess until 9 a.m. tomorrow morning.